```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| ANA VANARTSDALEN,<br><br>    Plaintiff,<br><br>    v.<br><br>TOWNSHIP OF EVESHAM, LINDA NELSON, and DIANA DICICCO,<br><br>    Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 05-1508 (JEI)<br><br>**OPINION** |

**APPEARANCES:**

HAHALIS & KOUNOUPIS, PC
By: David L. Deratzian
1015 New Durham Road
Edison, NJ 08817
    Counsel for Plaintiff

CAPEHART & SCATCHARD, P.A.
By: Armando V. Riccio
Laurel Corporate Center
8000 Midlantic Drive
Suite 300
Mount Laurel, NJ 08054
    Counsel for Defendants

**IRENAS**, Senior District Judge:

   Plaintiff commenced this action on March 17, 2005, against Defendants Township of Evesham ("Evesham"), Linda Nelson, and Diana Dicicco.[1]  Plaintiff makes eight allegations against

---

[1] Plaintiff consents to the dismissal of Diane DiCicco from this action.  (Pl. Br. at p. 3 n.1).

Defendants Evesham and Nelson: (1) discrimination based on national origin or ethnicity in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*; (2) retaliation in violation of Title VII; (3) negligence under Title VII; (4) discrimination based on national origin or ethnicity in violation of the New Jersey Law Against Discrimination ("NJLAD"); (5) vicarious liability; (6) retaliation in violation of NJLAD; (7) retaliation in violation of New Jersey Conscientious Employee Protection Act ("CEPA"); and (8) intentional infliction of emotional distress.[2]

This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, and over the state claims pursuant to 28 U.S.C. § 1367(a).  Defendants move for summary judgment.  For the reasons set forth below, the motion for summary judgment will be granted on all federal law claims and retaliation claims.  The Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

### I.

Plaintiff is a Mexican-American, who describes her ethnicity as Hispanic.  (Df. Ex. A at 42:12-18).  In September, 2006, Plaintiff applied for the position of violations clerk in the Township Municipal Court of Evesham Township.  (*Id*. at 42:21-23).

---

[2] Plaintiff concedes that the claims for retaliation under Title VII and the NJLAD lack evidentiary support, and agrees to dismiss them from this action.  (Pl. Br. at p. 3 n.1).

Kim Fullerton, the Court Administrator, interviewed her for the position. Ms. Fullerton learned of Plaintiff's national origin and ethnicity during the interview, and hired her shortly after the interview. (*Id.* at 43:5-46:8).

In December, 2002, Diana DiCicco, a Human Resources Manager, interviewed Plaintiff regarding complaints made by two former employees against Defendant Nelson. (Df. Ex. A at 89:15-21). Defendant Nelson was the Assistant Court Administrator and Plaintiff's supervisor. During the interview, Ms. DiCicco inquired whether Plaintiff ever experienced discriminatory treatment from Defendant Nelson, and Plaintiff said no. (*Id.* at 93:8-24).

A week after the interview, Plaintiff went on maternity leave. (Df. Ex. A at 89:15-16). During the leave, the Township restructured the positions within the Municipal Court system. This restructuring split Plaintiff's former position into two: data entry clerk and violations clerk. (*Id.* at 48:21-40:5). Ms. Fullerton visited Plaintiff at her home, and allowed Plaintiff to choose a position between the two. Plaintiff chose to return as a violations clerk. (*Id.* at 49:1-15).

Plaintiff returned from her maternity leave in March, 2003. While Plaintiff was on maternity leave, the Municipal Court hired two new employees, Elaine Lesher and Caroline Diaz. Because the restructuring changed certain office procedures, Defendant Nelson

told Plaintiff on March 26, 2003, not to give the new employees any training or advice.  (Df. Ex. D at p. 1 ¶ 2).  Plaintiff claims that Defendant Nelson's tone was hostile and demeaning.  (*Id.*).  Plaintiff also claims that she did not receive training on the new procedures, whereas the two new employees received one-day training.  However, Plaintiff concedes that this was not because of her national origin, ethnicity, or accent.  (Df. Ex. A at 107:10-16).

   On April 25, 2003, Plaintiff complained to Ms. DiCcico regarding Defendant Nelson.  Plaintiff sent a three-page letter to Ms. DiCcico on April 28, 2003, memorializing the conversation on April 25th.  (Df. Ex. C).  Plaintiff complained of the following events: (1) on March 26, 2003, Defendant Nelson instructed Plaintiff not to give new employees any work related advice in a hostile and demeaning manner; (2) later that day, Defendant Nelson refused to apologize for the earlier incident and asserted her authority in a vicious manner; (3) Defendant Nelson continued to approach Plaintiff in the same demeaning manner; (4) Defendant Nelson failed to provide training to Plaintiff; (5) on April 22, 2003, Defendant Nelson embarrassed Plaintiff by impatiently dismissing her question; and (6) on April 25, 2003, Defendant Nelson reprimanded Plaintiff for giving the wrong advice to a new employee.  (Df. Ex. C).

   The April 28, 2003, letter did not include any allegations

of discrimination based on national origin or ethnicity. Plaintiff also testified in her deposition that Defendant Nelson's treatment towards her is similar to the manner in which Defendant Nelson treated other employees.[3]  (Df. Ex. A at 130:13-22).

On May 12, 2003, Plaintiff, her union representation, Defendant Nelson, Ms. Fullerton, and Ms. DiCicco held a meeting as result of the April 28, 2003, letter.  (Df. Ex. A at 136:22-138:23).  According to Plaintiff, the meeting "focused on [Defendant Nelson's] being rude and the excuse was the training." (*Id.* at 141:24-25).  Plaintiff did not raise any concern regarding national origin or ethnicity discrimination.  (*Id.* at 141:18-22).  This meeting reached a resolution satisfactory to Plaintiff.[4]  (*Id.* at 138:11-139:6).

Plaintiff testified that after the meeting, Defendant Nelson began sending her emails instead of engaging her in conversation as before.  (Df. Ex. A at 144:6-16).  Plaintiff believed Defendant Nelson was trying to document communications with her.

---

[3]  Plaintiff believed that Defendant Nelson had a personal grudge against her.  (Df. Ex. A at 130:19-22).  However, she did not articulate the basis for her belief or whether such a personal grudge was motivated by her ethnicity or national origin.

[4]  Plaintiff produced contradictory testimony later in the deposition that she was not completely satisfied with the resolution because these solutions were "just up in the air." (Df. Ex. A at 143:2-5).

(*Id.*).  Plaintiff also testified that these emails tend to exaggerate her mistakes.  (*Id.* at 146:13-23).

Plaintiff claims that Defendant Nelson criticized her Spanish accent on two occasions.  On June 23, 2003, Plaintiff was speaking with an agitated person and was trying to explain the procedures of the Municipal Court.  (Df. Ex. A at 59:10-15).  Plaintiff claims that she heard Defendant Nelson instructing Elaine Lesher to help the person because he could not understand Plaintiff.  (*Id.* at 59:17-21).  However, the person understood Plaintiff when she asked him about her speech.  (*Id.* at 60:1-5).  Plaintiff testified that she does not recall whether Defendant Nelson mentioned her Spanish accent during this confrontation.  (*Id.* at 60:6-18).

The second incident occurred on September 3, 2003.  According to Plaintiff, she was helping someone at the window.  Once again the customer was agitated.  (Df. Ex. A at 62:19-63:7).  Plaintiff claims that Defendant Nelson was far from the window, but saw that a customer was upset and assumed that Plaintiff's poor English was the reason and sent Elaine Kennedy to take over the task of helping the customer.  (*Id.* at 63:1-7).

Plaintiff claims that Defendant Nelson told her that Plaintiff should not help people in the window because they often do not understand her.  (Df. Ex. A at 63:9-64:3).  Specifically, Plaintiff claims that Defendant Nelson told her that "I don't

6

want you helping people in the window because they don't understand you because of your Hispanic accent." (*Id.* at 63:13-14). Plaintiff claims that this incident was extremely humiliating to her, and she retreated into the restroom and cried. (*Id.* at 64:14-20).

On September 23, 2003, Plaintiff confronted Defendant Nelson over the mishandling of a $400 money order. (Df. Ex. B at 37:6-38:11). After the confrontation, Plaintiff left work for lunch, and never returned. (*Id.* at 41:11-14). Plaintiff filed a union grievance, and a meeting was held in December, 2003, among Plaintiff, her union representative, and the Township Manger, Edward Sasdelli. (Df. Ex. B at 52:4-8). Mr. Sasdelli welcomed Plaintiff back to work in her previous position. (*Id.* at 53:11-18). In addition, Plaintiff's union representative also encouraged her to return to work. (*Id.* at 53:25-12). Plaintiff also testified that Mr. Sasdelli informed her that she could request a transfer to a different department, but that her position and salary may be readjusted. (*Id.* at 55:21-3). Plaintiff declined to return to work.

In a letter dated April 28, 2004, Mr. Sasdelli reiterated the offer for Plaintiff to return to her previous position. (Df. Ex. G). This letter was sent to Plaintiff's previous attorney. Plaintiff declined the offer and commenced this action on March 17, 2005.

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation and citation omitted; ellipsis in original).

## III.

Employment discrimination based on an employee's ethnicity or national origin is prohibited by Title VII:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . .

42 U.S.C. § 2000e-2(a)(1).

In a discrimination case brought under Title VII, courts apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Plaintiff bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence.[5]  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003).

To establish a *prima facie* case for discrimination, Plaintiff must establish that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) that non-members of the protected class were treated more favorably. *Sarullo*, 352

---

[5] Once Plaintiff establishes a *prima facie* case of discrimination, the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802. If Defendant meets this burden, the presumption of discriminatory action raised by the *prima facie* case is rebutted. *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

Plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable employment action. *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804.

9

F.3d at 797; *see also Gaspar v. Merck and Co., Inc.*, 118 F. Supp. 2d 552, 555 (E.D. Pa. 2000).

Because Plaintiff voluntarily resigned from her position, she must rely on the doctrine of constructive discharge to establish that she had suffered an adverse employment action. Constructive discharge occurs when an "employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984)); *see also Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir.1992). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).

Plaintiff cannot establish constructive discharge by simply showing a hostile work environment. *Spencer*, 469 F.3d at 317. A hostile work environment must rise to the level where one is forced to abandon her job to qualify as constructive discharge. *Id.*

The Third Circuit has enumerated a list of factors to be considered in the constructive discharge inquiry, although it also noted that these factors are not an absolute requirement for

10

recovery. *See Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1161 (3d Cir. 1993); *see also Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 168 (3d Cir. 2001). These factors include an employer's efforts to: (1) demote an employee; (2) reduce an employee's pay or benefits; (3) involuntarily transfer an employee to a less desirable position; and (4) alter an employee's job responsibilities. *Clowes*, 991 F.2d at 1161.

In *Goss v. Exxon Office Systems Co.*, 469 F.3d at 311, the case in which the Third Circuit first adopted the doctrine of constructive discharge, the plaintiff was a sales representative for Exxon in a lucrative territory. Goss's supervisor began interrogating her about her plans to have a family. Goss then became pregnant twice, and each time her supervisor became verbally abusive and expressed doubts about her ability to combine motherhood and a career. Goss miscarried both times and, upon her return to work after the second miscarriage, her supervisor informed her she would either have to accept a new territory or resign. The supervisor also described Goss as a "'wacko,' pregnant, and likely to leave." 747 F.2d at 888. The Third Circuit concluded that under these conditions a reasonable person in the employee's shoes would resign. *Id.*

By contrast, in *Duffy v. Paper Magic Group, Inc.*, the Third Circuit found that the plaintiff's stressful work environment was not "unbearable." 265 F.3d at 169. The work responsibilities of

11

plaintiff in *Duffy* did not significantly change, nor was she ever assigned degrading or menial tasks. *Id.* While her department was understaffed and the management deliberately delayed providing needed assistance, her job did not become impossible as a result of these staff shortages. *Id.* Furthermore, Duffy suffered exclusion from committees, hiring decisions, a single staff meeting, and a single supervisor seminar. *Id.*

In its analysis, the Third Circuit concluded that "although Duffy may have subjectively believed that these circumstances were too onerous to bear, no reasonable trier of fact could conclude that exclusion from committee membership or lack of hiring authority renders working conditions objectively intolerable." *Duffy*, 265 F.3d at 169.

In this case, the record does not support a claim for constructive discharge. The evidence shows that Plaintiff's complaints began in March, 2003, when she returned from her maternity leave. The conflict between Plaintiff and Defendant Nelson began over whether Plaintiff should provide work-related assistance to the new employees and whether Plaintiff can satisfactorily provide customer service.

Plaintiff's complaints against Defendant Nelson can be summarized as the following: (1) Defendant Nelson interacted with Plaintiff in a hostile and demeaning manner and refused to apologize for her mannerisms; (2) Defendant Nelson failed to

provide training to Plaintiff; (3) Defendant Nelson embarrassed Plaintiff by impatiently dismissing her question; and (4) Defendant Nelson questioned Plaintiff's ability to provide customer service because of her Spanish accent.

These complaints do not meet the *Clowes* factors.  Plaintiff was not demoted, nor was her salary or benefits reduced. Plaintiff was not involuntarily transferred to a new position; in fact, Ms. Fullerton offered her a choice between the two newly created positions and she voluntarily chose to become a violations clerk.  Finally, although there were some alterations in her responsibilities, they were the result of the Municipal Court's restructuring, not targeted specifically towards Plaintiff.  *See Clowes*, 991 F.2d at 1161.

Furthermore, as in *Duffy*, the record in this case reveals that while Plaintiff's work environment was stressful, it did not rise to the level of constructive discharge.  Defendant Nelson may have made Plaintiff's work more difficult by her crude and terse mannerisms, but she did not render Plaintiff's job impossible.  This fact is directly analogous to *Duffy*, where the management deliberately understaffed the plaintiff's department and delayed necessary assistance.  265 F.3d at 169.  Similarly, Plaintiff's work responsibilities did not significantly change, nor was she ever assigned degrading or menial tasks.  *Id.*  As the Third Circuit concluded, Plaintiff's subjective belief that these

circumstances were too onerous to bear is insufficient to establish constructive discharge under the objective standard. *Id.; see also Suders*, 542 U.S. at 141 (establishing the objective standard for constructive discharge analysis).

Finally, Plaintiff testified that other members of management, namely Ms. Fullerton and Mr. Sasdelli, were very responsive and receptive to her complaints and sought to address them. Ms. Fullerton, who initially hired Plaintiff, scheduled multiple meetings with Plaintiff in an attempt to resolve her conflict with Defendant Nelson. Mr. Sasdelli consistently informed Plaintiff that she was welcome back to her previous position or could consider a transfer to another department. During the December, 2003, meeting, even Plaintiff's union representative advised her to return to work.[6]

In conclusion, while Plaintiff's work environment may have been stressful, a reasonable person would not consider it unbearable. Thus, the Court must conclude that Plaintiff was not constructively discharged, and that she did not successfully establish a *prima facie* case for national origin or ethnicity discrimination. The Court will grant summary judgment in favor of Defendant Nelson on Counts I, II, and III.

---

[6] Ms. Fullerton, Mr. Sasdelli, and the union representative all advised Plaintiff to return to work. While their views were not *per se* reasonable, they tend to show that Plaintiff's belief that she could not return to work was not shared by others.

14

Plaintiff's Count V alleges that Defendant Evesham Township is vicariously liable for Defendant Nelson's discriminatory conduct.  Because the Court will grant summary judgment in favor of Defendant Nelson, Defendant Evesham Township cannot be held vicariously liable.  The Court will grant summary judgment on Count V.

### IV.

For reasons set forth above, the Court will grant summary judgment in favor of Defendants on Counts I, II, III, and V.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 444 (3d Cir. 1997) (the decision to decline to exercise supplemental jurisdiction over a plaintiff's remaining state law claims "is committed to the sound discretion of the district court").  The state law claims will be dismissed without prejudice.  The Court will issue an appropriate order.

Date: August 2, 2007

                                              s/*Joseph E. Irenas*
                                          JOSEPH E. IRENAS, S.U.S.D.J.